UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 12-MD-02324-LENARD/O'SULLIVAN

In re: HORIZON ORGANIC MILK
PLUS DHA OMEGA-3 MARKETING
AND SALES PRACTICE LITIGATION

_____/

## ORDER

THIS MATTER is before the Court on the Defendant's Motion to Strike and/or Exclude the Testimony and Opinions of Richard P. Bazinet, Ph.D. and Incorporated Memorandum of Law (DE# 146, 2/21/14). Having reviewed the applicable filings and the law, it is

ORDERED AND ADJUDGED that the Defendant's Motion to Strike and/or Exclude the Testimony and Opinions of Richard P. Bazinet, Ph.D. and Incorporated Memorandum of Law (DE# 146, 2/21/14) is **GRANTED** for the reasons stated herein.

## INTRODUCTION

The defendant, WhiteWave Foods Company, is a wholly-owned subsidiary of Dean Foods Company which manufactures, distributes, markets and sells milk products fortified with algal-derived DHA Omega-3 ("DHA"). These DHA-fortified milk products are marketed as and packaged in cartons with labels that state "Supports Brain Health" and "Supports a Healthy Brain." The plaintiffs are consumers from six states who purchased the DHA-fortified milk.[1] The plaintiffs claim that the defendant violated state

_____

[1] The plaintiffs filed putative class actions which have been consolidated and transferred to this Court in this multi-district litigation ("MDL").

laws by falsely representing on the milk cartons and in advertising that DHA "Supports Brain Health" and "Supports a Healthy Brain." The plaintiffs maintain that the defendant's representations about DHA in its products are false and that the competent, scientific evidence shows that these claims are false. The plaintiffs further maintain that they have suffered an economic injury because they all paid a premium price for the DHA-fortified milk products based on the defendant's false representations that DHA "Supports Brain Health" and "Supports a Healthy Brain."

On February 21, 2014, the defendant filed the instant motion seeking to strike or exclude the plaintiffs' expert, Richard P. Bazinet, Ph.D. <u>See</u> Defendant's Motion to Strike and/or Exclude the Testimony and Opinions of Richard P. Bazinet, Ph.D. and Incorporated Memorandum of Law (DE# 146, 2/21/14). The plaintiffs filed their response on March 31, 2014. <u>See</u> Plaintiffs' Opposition to Defendant's Motion to Strike and/or Exclude the Testimony and Opinions of Richard P. Bazinet, Ph.D. (DE# 186, 3/31/14). The defendant filed its reply on April 24, 2014. <u>See</u> Defendant's Reply in Support of Motion to Strike and/or Exclude the Testimony and Opinions of Richard P. Bazinet, Ph.D. (DE# 216, 4/24/14). This matter is ripe for consideration.

## STANDARD OF REVIEW

Under <u>Daubert v. Merrell Dow Pharms., Inc.</u>, 509 U.S. 579, 589 (1993) and Rule 702 of the Federal Rules of Evidence, the Court serves as a gatekeeper to the admission of scientific evidence. <u>Quiet Tech. DC-8 v. Hurel-Dubois UK Ltd.</u>, 326 F.3d 1333, 1340 (11th Cir. 2003) (citing <u>Daubert</u>, 509 U.S. 579, 589 (1993); <u>McCorvey v. Baxter Healthcare Corp.</u>, 298 F.3d 1253, 1256 (11th Cir. 2002)); <u>Rink v. Cheminova</u>, 400 F.3d 1286, 1291 (11th Cir. 2005). To determine the admissibility of expert

testimony under Rule 702, the Court must undertake the following three-part inquiry:

> (1) [T]he expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated by Daubert; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand evidence or to determine a fact in issue.

Quiet Tech., 326 F.3d at 1340-41 (citing City of Tuscaloosa v. Harcros Chems., Inc., 158 F.3d 548, 562 (11th Cir. 1998) (citing Daubert, 509 U.S. at 589) (other citation omitted). The Eleventh Circuit has cautioned that although some overlap among the inquiries regarding expert qualifications, reliability and helpfulness exist, "these are distinct concepts that courts and litigants must take care not to conflate." Id. at 1341. "The burden of establishing qualification, reliability, and helpfulness rests on the proponent of the expert opinion, whether the proponent is the plaintiff or defendant in a civil suit, or the government or the accused in a criminal case." United States v. Frazier, 387 F.3d 1244, 1260 (11th Cir. 2004) (en banc) (citing Quiet Tech., 326 F.3d at 1341).

District courts have broad discretion in deciding to admit or exclude expert testimony. Gen. Elec. Co. v. Joiner, 522 U.S. 136, 142 (1997). However, "[a] district court's gatekeeper role 'is not intended to supplant the adversary system or the role of the jury.'" Id. (citing Maiz v. Virani, 253 F.3d 641, 666 (11th Cir. 2001) (quoting Allison v. McGhan, 184 F.3d 1300, 1311 (11th Cir. 1999)). "Quite the contrary, '[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.'" Id. (quoting Daubert, 509 U.S. at 596).

3

<u>**ANALYSIS**</u>[2]

**A.      Dr. Bazinet's November 13, 2013 Report**

Richard P. Bazinet, Ph.D. is an expert in the field of nutritional neuroscience. He was retained by the plaintiffs "to review and assess the 'Supports Brain Health' and 'Supports a Healthy Brain' representations on the labels of, and in advertisements[3] for [the defendant's] organic milk and soy milk products with the algal oil derived DHA additive . . . ." Expert Report of Richard Paul Bazinet, Ph.D. (DE# 146-3 at 4-5, 2/21/14) (footnote added). Dr. Bazinet opines that the algal-derived DHA in defendant's milk products "is superfluous and provides no measurable brain health benefit or support." <u>Id.</u> at 5. In his November 13, 2013 report, Dr. Bazinet states that he:

> reviewed several levels of evidence including randomized controlled trials using DHA and others using mixtures of omega-3 fatty acids from fish oil as well as observational studies of fish oil and meta-analyses of these studies. However, **because there are sufficient randomized controlled trials assessing the algal DHA used in the Milk Products with added DHA on brain function, [he] did not need to consider studies examining fish oil, observational studies or other sources of lower quality evidence in forming [his] opinion.** And, [he] **limited [his] focus to healthy individuals** as that is the target population for the Milk Products with added DHA. [He] also **focused on the primary endpoint(s) of the trials as secondary analyses are not appropriate for drawing conclusions because they can produce spurious results**.

<u>Id.</u> at 5-6 (footnotes omitted).

_____

[2] Some of the documents filed by the parties contain multiple page numbers. To avoid confusion and for the sake of consistency, the undersigned will cite only to the page number appearing on the top right hand corner of the document that is automatically assigned by the Court's CM/ECF system.

[3] During his deposition, Dr. Bazinet testified that he "[p]robably [had] not" seen any advertisements from the defendant concerning the DHA fortified organic milk or soy milk products, but that he had reviewed the labels on the milk products. <u>See</u> Deposition of Dr. Bazinet (DE# 146-4 at 17, 2/21/14).

## B.    Dr. Bazinet's March 28, 2014 Declaration

In their response, the plaintiffs relied on the Expert Declaration of Richard P. Bazinet, Ph.D. (DE# 186-1, 3/31/14) dated March 28, 2014. The defendant has moved to strike the March 28, 2014 declaration which it calls Dr. Bazinet's "do-over report[ ]." Defendant's Request for Expedited Schedule and Motion to Strike New Expert Reports and Associated Portions of Plaintiffs' Briefs or, alternatively, for: (1) Leave to Re-Depose the Experts; (2) Leave to File Sur-Replies in Opposition to Class Certification; and Continuance of Remaining Pretrial Deadlines and the Trial Date; and (4) Attorney Fees, Expert Fees, Costs and Expenses (DE# 209 at 4, 4/7/14). The Court has denied the defendant's request for continuance of the trial and pretrial deadlines and the remaining portions of the motion to strike the March 28, 2014 declaration are presently pending before Magistrate Judge Chris McAliley. See Order (DE# 211, 4/8/14).[4]

The defendant argues that the Expert Declaration of Richard P. Bazinet, Ph.D. (DE# 186-1 at 7, 3/31/14) is a new expert report and contains new and different methods and opinions.[5] See Defendant's Request for Expedited Schedule and Motion

---

[4] This motion was initially referred to Magistrate Judge Jonathan Goodman. See Order (DE# 211, 4/8/14). On April 11, 2014, Magistrate Judge Goodman recused from the case and the matter was reassigned to Magistrate Judge McAliley. See Order of Recusal and Order of Reassignment (DE# 214, 4/11/14).

[5] The defendant identifies four areas in which Dr. Bazinet's "do-over report" differs from his original report: (1) the original report is 7.5 pages long and relied on 13 scientific references whereas the "do-over report" is 13 pages long and cites to 26 scientific references; (2) the original report states that Dr. Bazinet's focus was limited to healthy individuals whereas the "do-over report" states that the defendant's milk products provide no brain health benefits to any children or adults, (3) the original report does not define "brain health" whereas the "do-over report" suggests that brain health can mean one of two things, contribution to brain structure or contribution to brain function and (4) the original report provides no estimate for the uptake of DHA to the

to Strike New Expert Reports and Associated Portions of Plaintiffs' Briefs or,

alternatively, for: (1) Leave to Re-Depose the Experts; (2) Leave to File Sur-Replies in

Opposition to Class Certification; and Continuance of Remaining Pretrial Deadlines and

the Trial Date; and (4) Attorney Fees, Expert Fees, Costs and Expenses (DE# 209 at 2,

4/7/14). The defendant also relies on an alleged representation made by Dr. Bazinet at

his deposition that "[he] was not going to do any additional work for these cases . . . ."

Id. at 5. A closer reading of Dr. Bazinet's deposition transcript shows that his response

was much more equivocal.[6]

    The undersigned had reviewed both the November 13, 2013 original report and

---

brain whereas the "do-over report" now estimates uptake of DHA to the brain. See
Defendant's Request for Expedited Schedule and Motion to Strike New Expert Reports
and Associated Portions of Plaintiffs' Briefs or, alternatively, for: (1) Leave to Re-
Depose the Experts; (2) Leave to File Sur-Replies in Opposition to Class Certification;
and Continuance of Remaining Pretrial Deadlines and the Trial Date; and (4) Attorney
Fees, Expert Fees, Costs and Expenses (DE# 209 at 7, 4/7/14).

[6]    Q.    Have you been asked to do any further work
             regarding -- in connection with your retention in this
             litigation?

        A.    **Not yet**.

        Q.    Do you expect to do any further work in connection
             with your retention?

        A.    To be honest, I don't really now how the process
             goes, so **I'm not sure**.

        Q.    **At the moment** you do not have any additional work
             that you plan to do in forming your opinions in this
             litigation?

        A.    No.

Deposition of Dr. Bazinet (DE# 146-4 at 74, 2/21/14) (emphasis added).

the March 28, 2014 declaration as well as Dr. Bazinet's deposition testimony and finds

that although the March 28, 2014 declaration is more detailed than the November 13,

2013 original report, the scope of both reports are the same and Dr. Bazinet's opinions

are consistent with his deposition testimony. Both reports focus on the same five

randomized controlled trials ("RCTs") and discuss the three studies by Yurko-Mauro,

Quinn and Voigt in "unhealthy" individuals which Dr. Bazinet deemed "not relevant."

Compare Expert Report of Richard Paul Bazinet, Ph.D. (DE# 146-3 at 6-9, 2/21/14) with

Expert Declaration of Richard P. Bazinet, Ph.D. (DE# 186-1 at 9-13, 3/31/14). The fact

that the March 28, 2014 declaration is more detailed is expected as the November 13,

2013 report was filed in support of the plaintiffs' class certification motions whereas the

March 28, 2014 declaration was filed in preparation for trial, the burden of proof at the

class certification stage is different from the burden of proof at trial.

More importantly, the defendant cannot claim surprise as the alleged "do-over

report" was properly filed in accordance with the Court's scheduling order. According to

the Court's Scheduling Order, "[a]ll dispositive pretrial motions and memoranda of law .

. . **as well as any motions to exclude or limit proposed expert testimony**" were due

on April 22, 2014. Order Resetting Pretrial Conference and Trial, Establishing Pretrial

Deadlines, and Establishing Pretrial and Trial Procedures (DE# 124 at 2, 9/25/13)

(emphasis added). On January 7, 2014, well after Dr. Bazinet's November 13, 2013

original report had been filed, the Court issued an Order (DE# 143) extending certain

deadlines, including "Expert Witness Lists and summaries required by Local Rule

16.1(K) due by March 28, 2014." Order (DE# 143, 1/7/14).[7] The Court's Order was issued in response to the parties' joint request to extend certain pretrial deadlines including the deadline for which the "[p]laintiff[s] must furnish expert witness list to the Defendant, **along with the summaries/reports required by Local Rule 16.1 (K)** . . ." to March 28, 2014. See Joint Motion for Extension of Certain Pre-trial Deadlines (DE# 142 at 2-3, 12/30/13) (emphasis added). The defendant chose to file its Daubert motion seeking to exclude Dr. Bazinet on February 21, 2014, well in advance of the March 28, 2014 deadline for submitting expert reports and well in advance of the then deadline of April 22, 2014[8] for filing Daubert motions. Thus, the defendant cannot claim surprise that the plaintiffs chose to timely file the Expert Declaration of Richard P. Bazinet, Ph.D. (DE# 186-1, 3/31/14) on March 28, 2014, the deadline for submitting expert reports.

Because the undersigned finds that the Expert Declaration of Richard P. Bazinet, Ph.D. (DE# 186-1, 3/31/14) is consistent with Dr. Bazinet's deposition testimony and his original expert report (DE# 146-3) and was timely filed in accordance with the Court's Order (DE# 143), the undersigned will consider both the Expert Declaration of Richard P. Bazinet, Ph.D. (DE# 186-1, 3/31/14) and the arguments raised by the plaintiffs in their response brief based on the Expert Declaration of Richard P. Bazinet, Ph.D. (DE#

---

[7] Notably, if Dr. Bazinet's November 13, 2013 report had been a final, merits report, there would have been no need for the Court to extend the deadline for filing expert reports or there would have been language limiting the extension of time to expert reports that had not already been filed.

[8] At the parties' request, the Court further extended the deadline to file Daubert motions, stating that the parties " shall have until and including May 16, 2014 to file dispositive pretrial motion and **motions to exclude or limit proposed expert testimony**." Order (DE# 183, 3/20/14) (emphasis added).

186-1, 3/31/14). Even if Magistrate Judge McAliley disagrees with the undersigned and finds that the March 28, 2014 declaration should be stricken, the undersigned's ultimate conclusion that Dr. Bazinet's testimony is not reliable under <u>Daubert</u> remains the same. The undersigned will now turn to the merits of the defendant's <u>Daubert</u> motion.

**C.     The Merits of the Instant Motion**

The defendant seeks to strike or exclude the testimony of Dr. Bazinet on the grounds that it is not relevant and unreliable under Rule 702 of the Federal Rules of Evidence and <u>Daubert</u>. The defendant does not challenge Dr. Bazinet's qualifications as an expert. Thus, the undersigned will not address Dr. Bazinet's credentials as a scientist.

**i.     Relevance**

The defendant argues that Dr. Bazinet's testimony is not relevant because it does not "fit" the instant case for three reasons: (1) Dr. Bazinet testified at deposition that "[t]here's not enough evidence in the literature to show that the DHA in the [defendant's] products supports brain health," whereas the plaintiffs are seeking to prove that competent scientific evidence shows that the "Supports Brain Health" and "Supports a Healthy Brain" representations are actually false; (2) Dr. Bazinet limited his focus to "healthy" individuals, but the purported class of plaintiffs is "all purchasers" which include both health and unhealthy individuals and (3) the defendant never represented that its algal-derived DHA milk products would "improve brain function." Defendant's Motion to Strike and/or Exclude the Testimony and Opinions of Richard P. Bazinet, Ph.D. and Incorporated Memorandum of Law (DE# 146 at 3-4, 2/21/14).

"The party offering the expert testimony has the burden of demonstrating that the testimony is relevant to the task at hand and logically advances a material aspect of its case." Boca Raton Cmty. Hosp., Inc. v. Tenet Health Care Corp., 582 F.3d 1227, 1232 (11th Cir. 2009) (citation and internal quotation marks omitted). "The basic standard of relevance . . . is a liberal one . . ., but if an expert opinion does not have a valid scientific connection to the pertinent inquiry it should be excluded because there is no fit." Id. (citation and internal quotations omitted).

The plaintiffs maintain that Dr. Bazinet's testimony is relevant and "fits" the instant case. According to the plaintiffs, the defendant "blatantly ignores Dr. Bazinet's explicit conclusion that these representations are 'not true' and that 'the Milk Products with DHA do not support brain health." See Plaintiffs' Opposition to Defendant's Motion to Strike and/or Exclude the Testimony and Opinions of Richard P. Bazinet, Ph.D. (DE# 186 at 4, 3/31/14) (quoting Expert Report of Richard Paul Bazinet, Ph.D. (DE# 146-3 at 5); Deposition of Dr. Bazinet (DE# 146-4 at 32-33, 71, 3/31/14)). With respect to the defendant's claim that Dr. Bazinet's testimony is limited to healthy individuals whereas the purported class includes unhealthy individuals, the plaintiff responds that "Dr. Bazinet never testified that his opinion is limited to only healthy individuals or that his opinion would be different as to unhealthy individuals." Plaintiffs' Opposition to Defendant's Motion to Strike and/or Exclude the Testimony and Opinions of Richard P. Bazinet, Ph.D. (DE# 186 at 5, 3/31/14). Moreover, the plaintiff points out that the "[d]efendant's target market is limited to healthy individuals and the Milk Products are

only intended to be consumed by healthy individuals." Id.[9] Finally, the plaintiff states

that the defendant's argument that Dr. Bazinet's opinion is based on labeling claims the

defendant did not make – "that DHA Products would improve brain function or that

people's brains would not be healthy if they did not drink the DHA Products"[10] – is

"misleading" because "Dr. Bazinet focused his examination on [the d]efendant's

'supports brain health' and 'supports a healthy brain' representations, and considered

all available studies in arriving at the conclusion that these representations are false."

Id. at 6 (footnote omitted).

      In the instant case, the defendant focuses on one statement in Dr. Bazinet's

deposition testimony wherein he states that "[t]here is not enough evidence in the

literature to show that the DHA in the products supports brain health . . . ,"[11] but ignores

other portions of the deposition wherein Dr. Bazinet states that "in North America . . .

the addition of DHA in the milk products does not support brain health," that "dietary

DHA does not support brain health in humans" and that "the conclusion is that these

---

[9] The defendant states that the plaintiffs must prove that the defendant's representations are false as to all putative classes which includes both healthy and unhealthy individuals. See Defendant's Motion to Strike and/or Exclude the Testimony and Opinions of Richard P. Bazinet, Ph.D. and Incorporated Memorandum of Law (DE# 146 at 10, 2/21/14). The defendant notes that while it has never marketed its DHA products to treat or cure any disease, everyone is allowed to purchase its milk products and "there is no doubt that a significant number of people" in the putative classes are not healthy. Defendant's Reply in Support of Motion to Strike and/or Exclude the Testimony and Opinions of Richard P. Bazinet, Ph.D. (DE# 216 at 6, 4/24/14).

[10] Defendant's Motion to Strike and/or Exclude the Testimony and Opinions of Richard P. Bazinet, Ph.D. and Incorporated Memorandum of Law (DE# 146 at 10-11, 2/21/14).

[11] Deposition of Dr. Bazinet (DE# 146-4 at 74, 2/21/14).

studies which have used much heavier doses than the product, do not support brain health, and therefore, the amount of DHA in the product does not support brain health." Deposition of Dr. Bazinet (DE# 146-4 at 32, 71, 2/21/14). Dr. Bazinet's report (DE# 146-3 at 5) and his declaration (DE# 186-1 at 14, 3/31/14) conclude that "[t]he algal oil derived DHA in the Milk Products is superfluous and provides no measurable brain health benefit or support" and that "based upon the clinical evidence from randomized controlled trials it is clear that algal oil DHA provides no brain health benefits," respectively. Therefore, the undersigned concludes that Dr. Bazinet's testimony that the defendant's algal DHA-derived products do not support brain health does fit the case. Whether this testimony is reliable is a separate issue that will be addressed below.

The defendant also argues that Dr. Bazinet's testimony does not fit the case because he focused on studies of healthy individuals whereas the putative classes include unhealthy individuals. In his original report, Dr. Bazinet stated that  "[he] limited [his] focus to healthy individuals as that is the target population for the Milk Products with added DHA." Expert Report of Richard Paul Bazinet, Ph.D. (DE# 146-3 at 6, 2/21/14). In the March 28, 2014 declaration, Dr. Bazinet stated that he "[understood] from counsel for the plaintiffs that the Milk Products are marketed to healthy children and adults, but as set forth below, it is [his] opinion that the Milk Products provide no brain health benefits **to any children or adults**." Expert Declaration of Richard P. Bazinet, Ph.D. (DE# 186-1 at 4, 3/31/14) (emphasis added). Dr. Bazinet's March 28, 2014 declaration further explains that he:

> also reviewed 3 trials in "unhealthy" subjects (one in children with Attention Deficit Hyperactivity Disorder [ADHD], one in adults with Mild Cognitive Impairment and one with age-related memory impairment).

> **These studies are not relevant to Defendant's Milk as Plaintiffs'
> counsel has advised that Defendant does not market the Milk
> Products to unhealthy people.** In any event, **the results of these trials
> do not alter [his] conclusion** as two show a lack of efficacy and the third
> is unreliable as it switched primary and secondary endpoints between
> registration and reporting.

Id. at 8 (footnotes omitted; emphasis added). While the defendant did not specifically

target unhealthy consumers in promoting their products, the plaintiffs seek to certify all-

purchaser consumer classes which necessarily include both healthy and unhealthy

individuals. Dr. Bazinet's opinion that "the Milk Products provide no brain health benefits

to **any** children or adults" fits all individuals in the putative classes. Expert Declaration of

Richard P. Bazinet, Ph.D. (DE# 186-1 at 4, 3/31/14) (emphasis added). Whether Dr.

Bazinet's opinion is based on reliable methodology that can be extrapolated to both

healthy and unhealthy individuals is a separate question which will be addressed below.

For purposes of "fit," it is sufficient that Dr. Bazinet's opinion that "the Milk Products

provide no brain health benefits to **any** children or adults" applies to all plaintiffs. Id.

Lastly, the defendant maintains that the only labeling claims at issue are

"Supports Brain Health" and "Supports a Healthy Brain." Thus, because the defendant

did not make any representations that its "DHA Products would improve brain function

or that people's brains would not be healthy if they did not drink the DHA Products" and

because Dr. Bazinet testified that "brain function" is different from "brain health," Dr.

Bazinet's testimony does not fit the case. See Defendant's Motion to Strike and/or

Exclude the Testimony and Opinions of Richard P. Bazinet, Ph.D. and Incorporated

Memorandum of Law (DE# 146 at 11, 2/21/14). At deposition, Dr. Bazinet testified as

follows:

> Q.   **Is brain function something different to you than brain health?**
>
> A.   **Yes**.
> .
> Q.   What's the distinction in your mind?
>
> A.   Brain function would include neurochemical reactions that we don't -- that you can remove double and don't have any known impact on the brain.
>
> Q.   But a functioning -- to have a healthy brain one has to have a functioning brain, correct?
>
> A.   **Your brain must to function for it to be healthy. If it didn't function, it would not be healthy**.

Deposition of Dr. Bazinet (DE# 146-4 at 26, 2/21/14) (emphasis added). In his March 28, 2014 declaration, Dr. Bazinet states "[b]rain health, in this context, can only mean one of two things: (1) contribution to brain structure or (2) contribution to brain function." Expert Declaration of Richard P. Bazinet, Ph.D. (DE# 186-1 at 4, 3/31/14). Dr. Bazinet then explains that because the amount of DHA in the defendant's milk products is trivial and cannot contribute to brain structure, the only possible benefit of DHA in the defendant's milk products is to brain function:

> Based on the amount of DHA that appears in the plasma pool that is available to the brain, upon an oral dose of 50 mg of labeled DHA2, and the amount of DHA that the brain uptakes from this plasma pool, [Dr. Bazinet] estimate[s] that about 0.0005% of the dose enters the brain in 24 hours with much less entering in each subsequent day. Thus about 0.00016 mg of a 32 mg serving of the DHA in the Milk Products would enter the brain in the first 24 hours with less entering in each subsequent day. Being that the brain contains about 5000 mg of DHA3, a serving of the Milk Products would replace about 0.0000032% of the brain's DHA content in the first day. While these calculations are an estimation that may vary within a range of 10-100 times in either direction, **even at the highest point in the range the DHA in the Milk Products is trivial and**

**cannot meaningfully contribute to brain structure. Thus, the only possible benefit of the DHA in the Milk Products could be brain function**.

Id. at 4-5 (footnotes omitted; emphasis added). The defendant's labeling claims state that its algal-derived DHA milk products "Support[ ] Brain Health" and "Support[ ] a Healthy Brain." Dr. Bazinet indicates that "brain function" is a measure of a healthy brain. Based on the foregoing, the undersigned concludes that Dr. Bazinet's testimony "fits" the instant case.

    **ii.**    **Reliability**

The defendant further argues that Dr. Bazinet's methodology is unreliable because: (1) Dr. Bazinet "cherry-picked" five randomized controlled trials ("RCTs") among "over a thousand scientific articles on DHA and the brain;" (2) the five "cherry-picked" RCTs do not support Dr. Bazinet's testimony and (3) Dr. Bazinet fails to explain how these 5 RCTs involving 49 women and 658 children (mostly in the United Kingdom) can be reliably extrapolated to all "healthy" people. See Defendant's Motion to Strike and/or Exclude the Testimony and Opinions of Richard P. Bazinet, Ph.D. and Incorporated Memorandum of Law (DE# 146 at 4-5, 2/21/14).

    **a.**    **Whether Dr. Bazinet "Cherry-picked" the Five RCTs**

The defendant maintains that there are 1,375 scientific articles using the terms "DHA and brain," yet Dr. Bazinet "cherry-picked" the five RCTs to support his conclusion. See Defendant's Motion to Strike and/or Exclude the Testimony and Opinions of Richard P. Bazinet, Ph.D. and Incorporated Memorandum of Law (DE# 146 at 12, 2/21/14). The defendant notes that Dr. Bazinet did not consider studies

examining fish oil, even though "Dr. Bazinet admitted that there is no nutritionally relevant difference between the DHA from fish and the vegetarian DHA from algae." Id. at 12-13.  The defendant further notes that "Dr. Bazinet also did not rely on any animal studies even though he agreed that 'the brains of mammals are similar in their lipid profile'" and it would be unethical to study the metabolism of DHA in the brains of humans. Id. at 13. The defendant faults Dr. Bazinet for not considering observational studies and for disregarding the Dietary Guidelines for Americans 2010 issued by the U.S. Department of Health and Human Services and Agriculture recommending "that Americans more than double their fish intake, specifically to obtain more dietary DHA." Id. at 13. Finally, the defendant notes that Dr. Bazinet also ignored his own published article on DHA, an article Dr. Bazinet co-authored with Michael A. Crawford (DE# 146-2, 2/21/14) (hereinafter "Crawford article") .

The defendant's arguments go to the weight the trier of fact should give to Dr. Bazinet's testimony and not its admissibility. While the defendant is correct that an expert may not "cherry pick" the available data in order to manufacture a desired result, Dr. Bazinet has provided a reasonable, scientific explanation why he relied on some studies (the five RCTs involving algal derived DHA) and discounted other studies. Dr. Bazinet explained that RCTs are the "gold standard" when it comes to scientific studies and that observational studies are less reliable. See Deposition of Dr. Bazinet (DE# 146-4 at 22, 2/21/14) (testifying that in the hierarchy of available literature, randomized controlled trial (RCTs) are the "gold standard"); Expert Declaration of Richard P. Bazinet, Ph.D. (DE# 186-1 at 7, 3/31/14) (stating that "[o]ther lines of evidence, including prospective and cross-sectional observational (epidemiological) studies that

16

have examined food intake or blood levels of a nutrient, **can be used to generate hypotheses, but experts in the field do not consider them to establish cause and effect relationships, particularly when there are adequate RCTs addressing the question**.") (emphasis added).

During his deposition, Dr. Bazinet testified that there was no difference between the DHA molecule that comes from algae and the DHA molecule that comes from fish. See Deposition of Dr. Bazinet (DE# 146-4 at 15, 2/21/14). The defendant cites this testimony as evidence that Dr. Bazinet unreasonably excluded studies involving DHA derived from fish oil. See Defendant's Motion to Strike and/or Exclude the Testimony and Opinions of Richard P. Bazinet, Ph.D. and Incorporated Memorandum of Law (DE# 146 at 12-13, 2/21/14). According to Dr. Bazinet, "fish oil contains EPA in addition to DHA. Unlike DHA, it is established that EPA can have an affect on brain function." Expert Declaration of Richard P. Bazinet, Ph.D. (DE# 186-1 at 7, 3/31/14). Thus, according to Dr. Bazinet, studies involving fish derived DHA are not helpful in determining whether the algal derived DHA in the defendant's milk products "Supports Brain Health" and/or "Supports a Healthy Brain." Id. at 6 (stating that studies involving the effect of fish or fish oils on the brain "have no bearing to the questions at hand as they involve other active substances involved in brain health other than DHA . . . .").[12]

_____

[12] During his deposition, Dr. Bazinet similarly testified that it would be improper to rely on studies involving fish derived DHA:

>     Q.   If a study concluded that an algal DHA supplement is bioequivalent to cooked salmon in delivering DHA to [the] human body for absorption, wouldn't that seem to make studies involving seafood consumption relevant to the issues in this case?

With respect to animals studies, Dr. Bazinet testified as follows:

Q.      Why did you not consider any studies done on animals in your litigation report?

A.      **I would say I considered many studies done on animals in my litigation report, but I didn't include them.**

Q.      Which studies of animals did you consider?

A.      There would be too many to list that I would have considered.

Q.      Did the -- did the studies on animals that you considered appear in the -- or are they included in the documents that you've produced in this litigation?

A.      No, they're not.

Q.      And are those studies you recall by memory?

A.      Some of them, yes.

*** 

Q.      **And in your view, you did not include them because they were less reliable sources of information?**

_____

A.      No, it would not.

Q.      And why not?

A.      **Because seafood also contains an omega-3 fatty acid called EPA that the Martek product [the algal DHA found in the defendant's milk products] typically does not contain.**

Q.      And that alone in your view makes any of the studies of seafood consumption irrelevant for purposes of reaching the opinions you've reached in [this] case?

A.      Not that alone, but **that would be one factor.**

Deposition of Dr. Bazinet (DE# 146-4 at 19, 2/21/14) (emphasis added).

      **A.**      **No, because they don't address the question I was trying to answer.**

      Q.      The question being whether supplementation with DHA supports brain health?

      **A.**      **Yeah, and I made an assumption that that claim was related to humans.**

      Q.      Were you told by counsel that that claim related solely to humans?

      A.      No, I wasn't, but I'm not aware of any animals that purchase the milk products.

      Q.      No. But you did testify a moment ago that the mammal -- the brain of the mammal is similar in lipid profiles to humans, correct?

      A.      There are similar aspects, yes.

      **Q.**      **And so an animal's consumption of a DHA milk product may have a similar application in its brain to that of humans?**

      **A.**      **It would -- it would depend on many factors, but you could make a case where you could see similarities, yes.**

Deposition of Dr. Bazinet (DE# 146-4 at 25, 2/21/14) (emphasis added).

Similarly, the defendant's criticism that Dr. Bazinet disregarded the Dietary Guidelines for Americans 2010 issued by the U.S. Departments of Health and Human Services and Agriculture, which recommended that Americans more than double their fish intake and that statements made in the Crawford article (DE# 146-2, 2/21/14) contradict Dr. Bazinet's opinion in the instant case are the subject of cross-examination. Dr. Bazinet has provided explanations why his statements on DHA in the Crawford article do not undermine his opinion in the instant case and why the USDA report is not relevant to whether algal-derived DHA supports a healthy brain. See Deposition of Dr. Bazinet (DE# 146-4 at 59-61) (discussing the USDA report); id. at 23-31 (discussing the

Crawford article).

> Dr. Bazinet did not "cherry-pick" the 5 RCTs. Dr. Bazinet has explained that:
>
> When examining evidence to support consumption of a nutrient or food, randomized controlled trials ("RCT") are considered the gold standard. Other lines of evidence, including prospective and cross-sectional observational (epidemiological) studies that have examined food intake or blood levels of a nutrient, can be used to generate hypotheses, but experts in the field do not consider them to establish cause and effect relationships, particularly when there are adequate RCTs addressing the question. Furthermore, I am not aware of any epidemiological studies of algal DHA and brain function.

Expert Declaration of Richard P. Bazinet, Ph.D. (DE# 186-1 at 7, 3/31/14). The defendant's criticisms of Dr. Bazinet's opinion go to the weight rather than the admissibility of the evidence. See In re Chantix (Varenicline) Prod. Liab. Litig., 889 F. Supp. 2d 1272, 1280 (N.D. Ala. 2012) (defendant's challenges to an expert's methodology "asserting that his combining of data from controlled and uncontrolled trials somehow 'tainted' that data . . . goes to the weight of his testimony, not its admissibility. Although the defendant **offers that other studies excluded the data relied on by [the expert]** in counting depression-related events, the defendant may argue this on cross-examination. . . .[t]he fact that no other researcher combined data in the manner [the expert] did does not make [the expert's] data necessarily flawed. Rather, these and the other objections defendant has to [the expert]'s report are matters of credibility, not reliability, and are strictly within the province of the jury.") (emphasis added).[13]

---

[13]In response to the defendant's objection to another expert, the Chantix court noted that "[w]hy [that expert] chose to include or exclude data from specific clinical trials is a matter for cross-examination, not exclusion under Daubert." In re Chantix, 889 F. Supp. 2d at 1288.

Dr. Bazinet has offered an explanation for how and why he analyzed the available research in the manner in which he did. Whether Dr. Bazinet's explanation withstands rigorous cross-examination is not at issue before this Court. Dr. Bazinet's credibility as a witness and the correctness of his opinion are not the proper subject of a Daubert inquiry. "A district court's gatekeeper role under Daubert is not intended to supplant the adversary system or the role of the jury." Quiet Tech., 326 F.3d at 1341 (citation and internal quotation marks omitted). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." Daubert, 509 U.S. at 596.

**b.    Whether the Five RCTs Support Dr. Bazinet's Opinion**

The defendant next argues that the 5 RCTs relied on by Dr. Bazinet do not support his testimony. See Defendant's Motion to Strike and/or Exclude the Testimony and Opinions of Richard P. Bazinet, Ph.D. and Incorporated Memorandum of Law (DE# 146 at 16-19, 2/21/14). The 5 RCTs relied on by Dr. Bazinet are the Johnson, Ryan, Kennedy, McNamara and Richardson RCTs. See Expert Report of Richard Paul Bazinet, Ph.D. (DE# 146-3 at 7, 2/21/14) (Table 1). The defendant argues that the McNamara RCT does not support Dr. Bazinet's opinion because:

> The **main finding** of the present study was that 8 wk of supplementation with either low- or high-dose DHA significantly increased functional activation in the DLPFC (BA9) [dorsolateral prefrontal cortex of the brain] during performance of an attention task compared with placebo. However, [t]his imaging trial had **important limitations**. . . .[T]he high level of performance [on the attention task] exhibited by all groups (80-90% accuracy) may have prevented the detection of potential performance-enhancing effects of DHA supplementation" and "the relatively small

21

number of subjects randomly assigned to each treatment group may not
be a representative sample of this age group.

Defendant's Motion to Strike and/or Exclude the Testimony and Opinions of Richard P.

Bazinet, Ph.D. and Incorporated Memorandum of Law (DE# 146 at 16, 2/21/14).

(footnotes and quotation marks omitted; emphasis and alternations in defendant's

brief). The defendant argues that in contrast to the McNamara RCT, Dr. Bazinet opines

that "randomized controlled trials . . . consistently show no effect of algal oil derived

DHA on the brain function in healthy subjects." Id. at 17 (quoting Expert Report of

Richard Paul Bazinet, Ph.D. (DE# 146-3 at 5, 2/21/14). Similarly, the defendant argues

that the remaining four RCTs do not support Dr. Bazinet's opinion that algal-derived

DHA has no effect on brain function because they contain the following contradictory

conclusions:

| RCT | Allegedly Contradictory Conclusion: |
|---|---|
| Richardson | "**DHA supplementation appears to offer a safe and effective way to improve reading and behavior** in healthy but underperforming children from mainstream schools." |
| | "Dietary intakes of long-chain omega-3 in modern western-type diets are **widely acknowledged to be sub-optimal**, both for general physical health and for **mental health and performance**." |
| Ryan | "There is supportive evidence for a significant association between higher DHA levels in blood and improved scores on a test of listening comprehension and vocabulary in healthy preschool children. **That healthy young children may benefit from DHA supplementation is promising**." |
| | "**Some issues were identified** while the statistical analysis was completed that may have decreased the likelihood of attaining statistically significant end points. . . . The use of different or more challenging tests might have avoided the ceiling effect and |

22

provided statistically analyzable data for a greater number of subjects. The **difficulty in identifying subtle effects of cognitive development** during childhood may be related to slight differences in techniques of cognitive testing between study sites and psychologists."

Johnson
"Deficiency of DHA, a **dietary** fatty acid that is particularly enriched in fish, and which is **required for brain function** has been implicated in cognitive decline."

"Following supplementation, verbal fluency scores improved significantly in the DHA, lutein, and combined treatment groups. … **These exploratory findings suggest that DHA and lutein supplementation may have cognitive benefit for older adults**."

Kennedy
"Omega-3 fatty acids are derived solely from the diet, but **often** occur at **lower than optimum** levels in the modern diets of those living in developed countries."

"With respect to brain function, incorporation of adequate amounts of the long-chain omega-3 fatty acid, docosahexaenoic acid (DHA), into neural cell membranes is **essential for normal brain function**."

"In general, there is evidence that deficiencies in dietary DHA can result in a number of peripheral and central nervous system impairments. These include impairments to visual acuity, cognitive development and other neurological functions. It follows that **optimising consumption** of omega-3 fatty acids may be **beneficial** to physiological and **neurological functioning**."

"[I]t would be **premature to conclude** that there is no efficacy for omega-3 fatty acids in these domains without first considering several methodological and cohort-related factors that might have influenced the pattern of results. The first is the **size of the sample**. With 30 children per group, a post-hoc calculation shows that the study had a 73% chance of detecting a medium effect size, rather than the 80% chance  generally accepted as satisfactory, suggesting a slight lack of power. Naturally, the **length of the treatment regimen** is another consideration. … The **nature of the cohort** of children also merits consideration. … One further consideration is that the **placebo** that was employed … **contained** the fatty acids α-linolenic acid

23

(**ALA**) and linoleic acid (**LA**)."

Id. at 17-18 (emphasis in defendant's brief). The plaintiffs maintain that "the [d]efendant's use of the secondary subgroup analysis and the authors' after-the-fact limitation notations only go to the weight of Dr. Bazinet's opinions, not their admissibility." Plaintiffs' Opposition to Defendant's Motion to Strike and/or Exclude the Testimony and Opinions of Richard P. Bazinet, Ph.D. (DE# 186 at 16, 3/31/14).

With respect to the McNamara RCT, the plaintiffs point out that the "primary and pre-registered objective was to measure visual sustained attention performance" and that "[t]he authors [of that study] concluded that there were 'no significant group differences' between the DHA groups and [the] placebo group." Plaintiffs' Opposition to Defendant's Motion to Strike and/or Exclude the Testimony and Opinions of Richard P. Bazinet, Ph.D. (DE# 186 at 13, 3/31/14) (quoting McNamara RCT (DE# 146-8 at 5, 2/21/14). The McNamara RCT did find "that 8 wk of supplementation with either low- or high-dose DHA significantly increased functional activation in the DLPFC (BA9) [dorsolateral prefrontal cortex of the brain] during performance of an attention task compared with placebo." Id. at 6. During his deposition, Dr. Bazinet testified as follows with respect to this statement in the McNamara RCT:

> Q.   The main finding, so the main finding that this author, who performed this study and published it, chose to report to the scientific community and the world is that the supplementation had a positive impact on the functional activation of the brain?
>
> A.   So yes, that is not inconsistent with anything in my report. And two is, that's not the primary finding.
>
> Q.   How is that -- how is that not inconsistent with your statement that DHA supplementation does not support brain health?

24

A.      I don't know, and I don't think Bob – Robert McNamara knows, based on conversations with him, how to relate changes in this activation because if you look at the results in detail -- I could have this backwards -- they may have went up with the 400 dose, and they may have went down with the 800 dose. We have to check the paper, though, because I could have it the opposite. They may have went up with the  800 down with the 400 dose.

**I don't think anybody knows how this relates to brain health.**

Q.      Well, isn't a -- wouldn't you in your opinion say that a performing cortical activation be supportive of brain health, isn't that brain health?

A.      No,  no.

Q.      So if the -- what does this DLPFC stand for?

A.      Dorsal lateral pre-frontal cortex.

Q.      If your dorsal lateral prefrontal cortex is not performing, is your brain healthy?

A.      So I just want to be clear. This brain region was performing in all the subjects. The measure of fMRI was different between all three, I believe, of the groups. So there are effects on this measure, but I don't know how to relate this measure to health.

Deposition of Dr. Bazinet (DE# 146-4 at 47, 2/21/14).

Dr. Bazinet provides additional explanations for the results of the remaining RCTs. Dr. Bazinet testified that the statement in the Richardson RCT that "DHA supplementation appears to offer a safe and effective way to improve reading and behavior in healthy but underperforming children from mainstream schools," is "a secondary analysis which is not considered as robust or we have to be very cautious with secondary analysis." Deposition of Dr. Bazinet (DE# 146-4 at 42, 2/21/14). With respect to the Ryan RCT, Dr. Bazinet testified that the statement that "healthy young

children may benefit from DHA supplementation is promising" was "not really a conclusion of the study. It's in a section called 'Conclusion,' but not everything in the section called 'Conclusion' is a conclusion. So this study didn't address the future and promise of this subject." Id. at 71. With respect to the Johnson RCT, Dr. Bazinet explained that "because Johnson made 25 measures with the DHA group, the 1 positive finding is likely due to chance and the 24 comparisons that did not differ from placebo show that 800mg per day of DHA does not provide brain health benefits." Expert Declaration of Richard P. Bazinet, Ph.D. (DE# 186-1 at 10, 3/31/14) Finally, with respect to the Kennedy RCT, Dr. Bazinet notes that "[b]ecause so many tests were conducted, both the one positive and the one negative finding are likely, due to chance alone" and that the authors themselves conclude that '[t]he results here do not suggest that supplementation with these doses of DHA for 8 weeks has any beneficial effect on brain function in cognitively intact children.'" Id. at 10-11.

The defendant's criticisms of Dr. Bazinet's interpretation of the RCTs go to the weight and credibility of Dr. Bazinet's testimony. Dr. Bazinet did not simply ignore the portions of the RCT that did not support his opinion. He analyzed the RCTs and gave detailed reasons why these RCTs support his opinion. The defendant's critique that Dr. Bazinet should have interpreted the results of the RCTs differently is more appropriately left for cross-examination. "The perceived flaws in the testimony of . . . experts are matters properly to be tested in the crucible of adversarial proceedings; they are not the basis for truncating that process." See United States v. 14.38 Acres of Land, Situated in LeFlore Cnty, MS, 80 F.3d 1074, 1079 (5th Cir. 1996).

### c.   Whether Dr. Bazinet can Extrapolate the 5 RCTs to the Purported Class of All-Purchasers

Finally, the defendant argues that Dr. Bazinet's testimony is unreliable under Daubert because he "failed to explain how he can extrapolate the results of five [ ]short studies in 49 women and 658 children to all 'healthy' people (let alone the 'all-purchaser' classes that [the p]laintiffs propose." Defendant's Motion to Strike and/or Exclude the Testimony and Opinions of Richard P. Bazinet, Ph.D. and Incorporated Memorandum of Law (DE# 146 at 21, 2/21/14). The defendant notes that "well over half of the subjects in Dr. Bazinet's five studies were children living in the United Kingdom" and that "Dr. Bazinet makes no attempt to demonstrate that the results of studies conducted on U.K. children can be reliably extrapolated to U.S. children, let alone adults." Id. at 22. The defendant further notes that "Dr. Bazinet's [March 28, 2014 declaration] is devoid of explanation as to how he can reliably extrapolate the studies he relies on to the facts of these cases, and [the p]laintiffs' opposition is likewise devoid of argument." Defendant's Reply in Support of Motion to Strike and/or Exclude the Testimony and Opinions of Richard P. Bazinet, Ph.D. (DE# 216 at 11, 4/24/14).

Neither the plaintiffs nor Dr. Bazinet address the defendant's extrapolation argument. "Determining the minimum sample size from which reliable extrapolations can be made to the sampled population is tricky." DeKoven v. Plaza Assocs., 599 F.3d 578, 581(7th Cir. 2010) (citing Floyd J. Fowler, Jr., Survey Research Methods 45 (4th ed. 2008). Here, Dr. Bazinet does not even attempt to argue that the sample size of the 5 RCTs of women and children (involving mostly subjects in the United Kingdom) are sufficient to make a reliable extrapolation to the putative classes of consumers of the

27

defendant's milk products in the United States. The undersigned is not saying that the 5 RCTs cannot scientifically be extrapolated to apply to the putative classes through reliable expert testimony. Rather, Dr. Bazinet simply ignores the issue and makes no attempt to explain how this extrapolation can be made. See In re Human Tissue Prods. Liab. Litig., 582 F. Supp. 2d 644, 678 (D. N.J. 2008) (excluding portions of expert's testimony in part because "[expert] failed to explain how studies involving discrete populations of individuals could be extrapolated to those outside of these discrete populations."); In re Phenylpropanolamine (PPA) Products Liability Litigation, 289 F. Supp. 2d 1230, 1246(W.D. Wash. 2003) (admitting expert testimony as reliable under Daubert where expert "clearly set forth the steps followed in extrapolating [the] evidence" even though "defendants demonstrated some problems posed by extrapolation and dispute the conclusions reached."). The party seeking to introduce the expert testimony has the burden of establishing reliability under Daubert. The plaintiffs have not shown that the RCTs underlying Dr. Bazinet's opinion can be reliably extrapolated to the putative classes. Based on this record, Dr. Bazinet's testimony is excluded as unreliable under Daubert.

## CONCLUSION

In sum, the defendant does not dispute Dr. Bazinet's qualifications as an expert in his field of nutritional neuroscience. Dr. Bazinet's opinion "fits" the plaintiffs' case in that his opinion addresses the issue of whether the algal derived DHA in the defendant's milk products "Supports Brain Health" and/or "Supports a Healthy Brain." The methodology used by Dr. Bazinet to reach his conclusions, however, is not reliable under Daubert because Dr. Bazinet fails to explain how he can reliably extrapolate the 5

28

RCTs upon which he basis his opinion to the all-consumer putative classes in the instant case. Based on the foregoing, it is

ORDERED AND ADJUDGED that the Defendant's Motion to Strike and/or Exclude the Testimony and Opinions of Richard P. Bazinet, Ph.D. and Incorporated Memorandum of Law (DE# 146, 2/21/14) is **GRANTED**. Dr. Bazinet's testimony is hereby excluded as unreliable under Daubert. It is further

ORDERED AND ADJUDGED that the Defendant's Request for Oral Argument on Defendant's Motions to Strike and/or Exclude Expert Testimony and Opinions (DE# 147, 2/21/14) is **DENIED as moot** to the extent it pertains to the motion concerning Dr. Bazinet.

**DONE AND ORDERED** in Chambers at Miami, Florida this **28th** day of April, 2014.

_____
JOHN J. O'SULLIVAN
UNITED STATES MAGISTRATE JUDGE

Copies provided to:
United States District Judge Lenard
United States Magistrate Judge Chris M. McAliley
All counsel of record